**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**

F I L E D

JUL 2 6 2018



CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

IRFAN RAHMAN, and ANTHONY
GIOVAGNOLI, Individually and On Behalf
of All Others Similarly Situated,

               Plaintiff,

    v.

GLOBALSCAPE, INC., MATTHEW C.
GOULET, and JAMES W. ALBRECHT,
JR., THOMAS W. BROWN, DAVID C.
MANN, FRANK M. MORGAN, and
THOMAS E. HICKS,

               Defendants.

Case No. 5:17-cv-00753



**JURY TRIAL DEMANDED**

**CLASS ACTION**

**FIRST AMENDED COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS[1]**

    Plaintiff Irfan Rahman ("Plaintiff"), by and through his attorneys, alleges upon personal

knowledge as to himself, and upon information and belief as to all other matters, based upon the

investigation conducted by and through his attorneys, which included, among other things, a

review of documents filed by Defendants (as defined below) with the United States Securities and

Exchange Commission (the "SEC"), conference call transcripts, news reports, press releases issued

by Defendants, and other publicly available documents, as follows:

**NATURE AND SUMMARY OF THE ACTION**

    1.    This is a federal securities class action on behalf of all investors who purchased or

otherwise acquired Defendant GlobalSCAPE, Inc. ("GlobalSCAPE" or the "Company") common

stock between January 26, 2017 through August 7, 2017 inclusive (the "Class Period"). This action

---

[1] The caption of the case has been updated to include Defendants added in this First Amended
Complaint.

is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      GlobalSCAPE develops and distributes secure file management software for individuals and business users to send data over the internet and Wide-Area File System collaboration and Continuous Data Products. It's common stock trades on the New York Stock Exchange.

3.      This case concerns a scheme to manage GlobalSCAPE's earnings in order to report better than expected or record earnings. The motive was clear: Defendants David L. Mann, Chairman of the Audit Committee, and Thomas Brown, Board Chairman, were hoping to sell $12 million of their stock in a January 2017 private transaction.

4.      Daniel Burke, GlobalSCAPE's former vice president of sales, falsified a sales transaction at year-end 2016 so that GlobalSCAPE could meet its projected 2016 earnings expectations. Burke was under pressure from his superiors to meet his sales targets so the stock sale could close. On the heels of this, Mann and Brown closed on their $12 million stock sale.

5.      On August 7, 2017, after trading had closed, GlobalSCAPE disclosed that its audit committee "has been conducting an investigation into certain transactions in the fourth quarter of 2016 involving improper arrangements with customers that circumvented the Company's internal controls and their potential effect on previously reported revenue." The Company further disclosed that it "intends to effect a restatement of its previously issued financial statements through filing an amended Annual Report on Form 10-K for the year ended December 31, 2016 and an amended Quarterly Report on Form 10-Q for the quarter ended March 31, 2017."

6.     On this news, GlobalSCAPE's share price fell 17.66% to close at $3.87 on August 8, 2017.

7.     On May 18, 2018, the United States filed a criminal information against Burke which alleged as follows:

> Beginning in July 2016, Burke participated in weekly forecast meetings. Prior to his first meeting, Burke put together his first sales forecast, which was for the third quarter of 2016 and was significantly short of the projected targets previously established. **Upon reviewing Burke's updated projections, he was told that that he needed to change his numbers.** Burke changed his forecast to reflect the numbers previously budgeted, despite the fact that he believed those budgeted numbers were unattainable. Notably, **GlobalSCAPE missed projected targets for the third quarter of 2016, and Burke was told "that's your mulligan, you're not going to miss again."**

> The financial results for the fourth quarter of 2016 were important to GlobalSCAPE because they would determine whether GlobalSCAPE met its annual growth targets. Further the company was seeking external investors for a potential major GlobalSCAPE share purchase in the first quarter of 2017. Consequently, Burke was involved in discussions to meet targets. Burke and another person decided to pursue potential "stocking orders" to meet targets, and Burke began contacting select GlobalSCAPE channel customers. "Stocking orders" involved the pre-purchase of GlobalSCAPE software by resellers at significant price discount. Although GlobalSCAPE had booked small "stocking orders" in past quarters, Burke and others in the company were expecting a large revenue shortfall in the fourth quarter of 2016.

> By the end of the fourth quarter, Burke and another person worked to meet management's reduced revenue target. **Solely to meet this target, GlobalSCAPE booked last minute deals with two channel customers.** However, Burke and another person had significant doubts about the companies' ability to repay GlobalSCAPE in a timely manner since these resellers would likely have to pay GlobalSCAPE in full for these licenses prior to selling them to end users. Consequently, a plan was implemented to facilitate the companies' ability to repay GlobalSCAPE by diverting unrelated projected first quarter 2017 GlobalSCAPE revenues to the companies. These "side agreements" were discussed with the companies verbally and via e-mail, but were not included in the deal documents.

> At the end of the year, Burke was still short of his sales goals. In an effort to meet those sales goals, Burke contacted Company A for the purpose of entering into a sales agreement that would give him the final amount needed to meet GlobalSCAPE's sales goals. Company A was not able to finalize a sales agreement within the period for Burke to book the sale in the 2016 time period to allow him to credit the sale as part of GlobalSCAPE's fourth quarter sales goal for 2016. Burke took it upon himself to create and make false material representations in a letter purchase order in the name of Company A indicating that a sale had occurred when, in fact, no such sale had occurred.

3

By this means, Burke was able to ingratiate himself with his superiors at GlobalSCAPE and ensure that he would continue to be employed by the company. Burke received a sales commission for booking the bogus transaction with Company A.

8.  The criminal information further provides that Burke sent the false purchase order to a GlobalSCAPE executive in San Antonio on December 30, 2016; that GlobalSCAPE reversed the recognized revenue from the associated transaction, but not before the amount had been improperly included for revenue for 2016, making it appear that GlobalSCAPE met its sales goals; and that the fraudulent figures were included on GlobalSCAPE's 10-K for 2016, which was filed and signed by Defendants Goulet and Albrecht.

9.  On May 31, 2018, Burke pled guilty to one count of wire fraud. At the plea hearing before the Honorable Fred Biery, Assistant United States Attorney Greg Surovic informed the court regarding the illegal activity at GlobalSCAPE, "Your Honor, **this is a continuing investigation. . . . There's more to be found out. And Mr. Burke is just the first person to come in**." (emphasis added).

10.  Also on May 31, 2018, a Grand Jury sitting in the Western District of Texas served GlobalSCAPE with a subpoena—seeking all documents and emails relating to the Company's internal investigation that led to the Restatement.

11.  It appears from Company disclosures that those "superior" to Burke were the CEO, CFO and the Board of Directors. The "potential major [GlobalSCAPE] share purchase in the first quarter of 2017" was the $12 million stock sale by Mann and Brown.

12.  After completing the audit of the 2016 year-end financial results, GlobalSCAPE fired its auditor, RSM US LLP ("RSM") and replaced them with BDO USA LLP ("BDO"). In May, 2017 the Audit Committee began to investigate the bogus sales transaction put together by Burke. Tellingly, the Audit Committee did not inform BDO of the investigation at the time. On

July 6, 2017 BDO learned for the first time that GlobalSCAPE was investigating certain 2016 sales transactions which, in BDO's views, may have constituted illegal acts under the Exchange Act. BDO then contacted Mann to inform him that the outside lawyers the Audit Committee retained to perform the investigation were not sufficiently independent of GlobalSCAPE to conduct such an investigation. Mann disagreed with BDO and stated that GlobalSCAPE would continue to utlize the same outside law firm. On August 1, 2017 GlobalSCAPE's Audit Committee terminated BDO and on August 7 publicly announced the need to restate its financial results.

13. RSM was re-engaged to re-audit and re-issue its year-end 2016 financial results. On November 24, 2017, after the close of the markets, GlobalSCAPE issued a Form 8-K announcing that RSM was withdrawing from its engagement to re-audit the 2016 financial results as it "concluded that, in its professional judgment, it could no longer rely on management's representations." After trading resumed on November 27, 2017 GlobalSCAPE's stock price fell 5.36% to close at $3.71 per share, causing additional losses to investors.

14. Although the size the restatement is relatively small, its impact is quite large. GlobalSCAPE reported a false sales transaction in December 2016 so it could report better financial results, allowing Mann and Brown to sell $12 million worth of stock. Mann hid the investigation from BDO and when BDO questioned the impartiality of the law firm hired to conduct the investigation, Mann via the audit committee fired BDO.

15. This is a classic case of earnings management – improperly recording sales to meet or exceed earnings expectations – to allow senior officers or directors to sell multi-million dollars worth of stock.

16. Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and

prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) GlobalSCAPE overstated the reported amounts of accounts receivable as of December 31, 2016, and license revenue for the three months and year ended December 31, 2016, by approximately $676,000 and $741,000, respectively, resulting in the overstatement of the Company's revenues for those periods by the same amounts; (ii) the Company's net-income and earnings per share were overstated by $400,000 and $.02 per share, respectively, amounting to an overstatement of approximately ten percent; (iii) the Company lacked adequate internal controls over financial reporting and failed to take timely and appropriate remedial action to address these inadequacies; and (iv) that as a result of the foregoing, GlobalSCAPE's publicly disseminated financial statements were materially false and misleading.

## JURISDICTION AND VENUE

17.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

19.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.  Additionally, many of the acts and practices

complained of herein occurred in substantial part in this District, and witnesses and individual defendants are located in here.

21.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Lead Plaintiff Irfan Rahman was a shareholder of GlobalSCAPE during the Class Period. As set forth in the certification October 10, 2017 (ECF No. 11-5), incorporated by reference herein, Plaintiff acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

23.     Defendant GlobalSCAPE, Inc. is a Delaware corporation with its principal place executive offices located at 4500 Lockhill Selma Road, Suite 150, San Antonio, Texas 78249. GlobalSCAPE's primary business is the sale and support of managed file transfer software ("MFT") for enterprises, which GlobalSCAPE refers to as its "EFT platform product." These software and services include the sale of perpetual software licenses, providing products under software-as-a-service, or SaaS, subscriptions, providing maintenance and support services, or M&S, and offering professional services for product customization and integration. The Company trades on the NYSE MKT exchange under the ticker symbol "GSB." During the Class Period, GlobalSCAPE, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's stock.

24.     Defendant Matthew C. Goulet ("Goulet") has served at all relevant times as GlobalSCAPE's Chief Executive Officer as well as a member of the Board of Directors. Defendant Goulet joined GlobalSCAPE as Vice President of Sales in 2013. From February 2015 to October 6, 2015, Defendant Goulet served as GlobalSCAPE's Vice President of Sales & Marketing, and was promoted to Chief Operating Officer on October 6, 2015. Defendant Goulet was promoted to his current position on May 16, 2016. Prior to joining GlobalSCAPE, Defendant Goulet served as Vice President of Small and Medium-sized Enterprise Sales and Initiatives for Kaspersky Lab. Throughout the Class Period, Defendant Goulet participated in the issuance of, signed, and/or certified as accurate the Company's public statements and periodic filings with the SEC, including:

- Form 8-K filed with the SEC on January 26, 2017 ("Q4 2016 Form 8-K") (and Exhibit 99.1 thereto) and Form 10-K (and Exhibits 31.1 and 32.1 thereto) filed with the SEC on March 27, 2017 ("2016 Form 10-K");

- Form 10-Q filed with the SEC on May 12, 2017 (Q1 2017 Form 10-Q) (and Exhibits 31.1 and 32 thereto) and Form 10-Q/A filed with the SEC on May 26, 2017 (Q1 2017 Form 10-Q/A) (and Exhibits 31.1 and 32 thereto);

- Form 8-K filed with the SEC on August 7, 2017 ("August 2017 Form 8-K").

25.     Defendant James W. Albrecht, Jr. ("Albrecht") was, at all relevant times, GlobalSCAPE's Chief Financial Officer, Executive Vice President, and Treasurer until March 2, 2018. As of March 19, 2018, the Company and Defendant Albrecht entered into a consulting agreement (the "Agreement") pursuant to which GlobalSCAPE will pay Defendant Albrecht his base salary at the time of his retirement through December 31, 2018 and will extend the period for exercising vested options until May 31, 2019. Defendant Albrecht joined the Company as its CFO in 2012. Prior to joining GlobalSCAPE, Defendant Albrecht had thirty-five years of experience in business and financial leadership roles in the software, high technology, and biotechnology industries, including serving as CEO and CFO of Express Digital Graphics, Inc., immediately prior

to joining GlobalSCAPE. Throughout the Class Period, Defendant Albrecht participated in the issuance of, signed, and/or certified as accurate the Company's public statements and periodic filings with the SEC, including:

- Form 8-K filed with the SEC on January 26, 2017 ("Q4 2016 Form 8-K") (and Exhibit 99.1 thereto) and Form 10-K (and Exhibits 31.2 and 32.1 thereto) filed with the SEC on March 27, 2017 ("2016 Form 10-K");

- Form 10-Q filed with the SEC on May 12, 2017 (Q1 2017 Form 10-Q) (and Exhibits 31.2 and 32 thereto) and Form 10-Q/A filed with the SEC on May 26, 2017 (Q1 2017 Form 10-Q/A) (and Exhibits 31.2 and 32 thereto);

- Form 8-K filed with the SEC on August 7, 2017 ("August 2017 Form 8-K).

26.     Defendant Thomas W. Brown currently serves as Chairman of GlobalSCAPE's Board of Directors and has served in such capacity since 2002. Defendant Brown has been an independent stockbroker and investment advisor in San Antonio since 1995. He entered the securities brokerage business in 1967. In addition to managing stock and bond investments, Defendant Brown is involved in the real estate development business in San Antonio. Defendant Brown owns approximately twelve percent of GlobalSCAPE's outstanding common stock. Defendant Brown's son-in-law, Robert Langenbahn, is employed as an Enterprise Sales Manager at GlobalSCAPE and earned $146,918 in base salary and commissions in 2017. On Janaury 9, 2017, Defendant Brown sold shares worth approximately $12 million to a private investment vehicle. Throughout the Class Period, Defendant Brown participated in the issuance of, signed, and/or certified as accurate the Company's public statements and periodic filings with the SEC, including:

- Form 8-K filed with the SEC on January 26, 2017 ("Q4 2016 Form 8-K") (and Exhibit 99.1 thereto) and Form 10-K filed with the SEC on March 27, 2017 ("2016 Form 10-K");

- Form 10-Q filed with the SEC on May 12, 2017 (Q1 2017 Form 10-Q) and Form 10-Q/A filed with the SEC on May 26, 2017 (Q1 2017 Form 10-Q/A); and

- Form 8-K filed with the SEC on August 7, 2017 ("August 2017 Form 8-K).

27.     Defendant David L. Mann currently serves as a member of GlobalSCAPE's Board of Directors and has served in such capacity since 2002. At all relevant times, Defendant Mann also served as Chairman of the Audit Committee. Defendant Mann is in the real estate development and home building business in San Antonio. Defendant Mann owns approximately seven percent of GlobalSCAPE's outstanding common stock. On January 9, 2017, Defendant Mann sold shares worth approximately $700,000 to a private investment vehicle. Throughout the Class Period, Defendant Mann participated in the issuance of, signed, and/or certified as accurate the Company's public statements and periodic filings with the SEC, including:

- Form 8-K filed with the SEC on January 26, 2017 ("Q4 2016 Form 8-K") (and Exhibit 99.1 thereto) and Form 10-K filed with the SEC on March 27, 2017 ("2016 Form 10-K");

- Form 10-Q filed with the SEC on May 12, 2017 (Q1 2017 Form 10-Q) and Form 10-Q/A filed with the SEC on May 26, 2017 (Q1 2017 Form 10-Q/A); and

    Form 8-K filed with the SEC on August 7, 2017 ("August 2017 Form 8-K).

28.     Collectively, Goulet, Albrecht, Brown, and Mann are referred to throughout this complaint as the "Individual Defendants."

29.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions within the Company

and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

30.     Defendant Frank M. Morgan ("Morgan") is a member of GlobalSCAPE's Board of Directors, and served on the Audit Committee of the Board at all relevant times.

31.     Defendant Dr. Thomas E. Hicks ("Hicks") is a member of GlobalSCAPE's Board of Direcors, and served on the Audit Committee of the Board beginning in May 2016.

32.     Collectively, Morgan and Hicks are referred to throughout this complaint as the "Control Person Defendants."

33.     The Control Person Defendants, as members of the GlobalSCAPE Board of Directors and of the Board's audit committee, directly or indirectly controlled those liable for violating § 10(b) of the Securities Exchange Act.

## SUBSTANTIVE ALLEGATIONS

### A.     *Background*

34.     GlobalSCAPE develops and sells computer software that provides secure information exchange, file transfer and file sharing capabilities for enterprises and consumers. Its primary business is the sale and support of managed file transfer software ("MFT") for enterprises, which it refers to as its Electronic File Transfer ("EFT" platform product").

35.     On May 16, 2016, GlobalSCAPE announced the appointment of Defendant Goulet as the Company's President and Chief Executive Officer. Goulet replaced GlobalSCAPE's previous CEO, James Bindseil, who resigned in the wake of a disappointing 2016 first quarter earnings report.

36.     In mid-2016, GlobalSCAPE reviewed the allocation of its product research and development resources across all of its products. As a result of that review, GlobalSCAPE decided to focus most of its engineering resources involved in product research and development on its EFT platform product.

37.     GlobalSCAPE had disappointing second and third quarters in 2016. The fourth quarter would determine whether GlobalSCAPE met its annual growth targets.

38.     As detailed herein, throughout the Class Period, Defendants misrepresented its accounts receivable and improperly recognized revenue relating to its EFT platform product. Such statements were materially false and misleading when made.

**B.** **_Materially False And Misleading Statements Made During the Class Period_**

39.     The Class Period begins on January 26, 2017, when GlobalSCAPE issued a press release and filed the same on Form 8-K with the SEC, entitled "GlobalSCAPE, Inc. Announces Financial Results for the Fourth Quarter and Fiscal 2016," summarizing the financial and operating results for the period ended December 31, 2016. These financial results, and the financial disclosures released on March 27, 2017, May 12, 2017, and May 26, 2017, contained materially false and misleading statements when those statements were made, including certifications in each disclosure that GlobalSCAPE's internal control over financial reporting were effective.

40.     In pertinent part, the Company's January 26, 2017 press release provided:

**Fourth Quarter 2016 Financial Summary:**
- Revenue for the fourth quarter of 2016 was $9 million, an increase of 7 percent when compared with the fourth quarter of 2015. This is the highest revenue quarter in GlobalSCAPE's history.
- For the fourth quarter of 2016, the Company's net income was $1.3 million, an 8 percent increase when compared to net income for the fourth quarter of 2015.
- Basic earnings per share was $0.06 for the fourth quarter of 2016.

**Fiscal 2016 Financial Summary:**

- Revenue for fiscal 2016 was $33.3 million, an 8 percent increase when compared to the same time period in 2015.
- Adjusted EBITDA for fiscal 2016 was $7.1 million compared with $7.2 million for the same period in 2015. Adjusted EBITDA is not a measure of financial performance under GAAP. It should not be considered as a substitute for net income presented on our condensed consolidated statement of operations and comprehensive income or for cash flow from operating activities presented on our condensed consolidated statement of cash flows.
- The Company had cash, cash equivalents and short-term investments of $24 million on December 31, 2016.
- Other than liabilities for normal trade payables and taxes, the Company has no debt.

**Fiscal 2016 Business Highlights:**
**Corporate:** GlobalSCAPE had several corporate milestones in 2016, including:
- The appointment of Matt Goulet as President and CEO;
- The promotions of Dan Burke to Vice President of Worldwide Sales and Adam Snider to Vice President of Operations;
- The appointment of Gary S. Mullen to Vice President of Marketing;
- The Company celebrated its 20th anniversary on April 17, 2016.

Additionally, the press release contained the following statement from Defendant

Goulet:

**Supporting Quote:**
**Matt Goulet, President and Chief Executive Officer at GlobalSCAPE**
"Data is the cornerstone of GlobalSCAPE's business, and while **we had another record-breaking revenue quarter**, we realize that we have only scratched the surface when seeking to help businesses protect and secure their data. **The commitment we made in the second half of 2016 to focus on our core EFT platform is propelling the product line forward to proactively address the future data management challenges of our customers**. Our sustained focus on strengthening our technology ecosystem while investing in research and development, technology alliance partnerships and technology acquisition is critical to our long-term success and growth."

(emphasis added).

41.      The press release quoted in ¶ 40 falsely represented that revenue for the fourth

quarter of 2016 was $9 million, an increase of 7% from the same period in 2015 when, in fact,

revenue was only $8.3 million, with revenue overstated by $741,000, or 8%. Compared to the

same period in 2015, GlobalSCAPE's revenue actually *decreased* by 3%, rather than the 7% increase originally reported. The press release quoted in ¶ 40 also falsely represented that the fourth quarter of 2016 was the highest revenue quarter in GlobalSCAPE's history when, in fact, the $8.75 million in revenue reported for the third quarter of 2016 as well as the $8.5 million in revenue reported for the fourth quarter of 2015 were clearly higher. The press release quoted in ¶ 40 further falsely represented that GlobalSCAPE's revenue for fiscal 2016 was $33.3 million when, in fact, revenue was only $32.5 million, with revenue overstated by 2.5%. Defendant Goulet's supporting quote was also false because GlobalSCAPE did not have a record-breaking quarter and because the EFT platform was not, in fact, propelling the product line forward.

42.     On March 27, 2017, GlobalSCAPE filed on Form 10-K with the SEC, its full year and quarterly financial results for the period ended December 31, 2016, providing the Company's consolidated financial results for that period summarized in the Company's January 26 press release reporting, among other things, its accounts receivable, revenues, assets, and stockholder equity:

### GlobalSCAPE, Inc.
### Consolidated Balance Sheets
(in thousands except share amounts)

| | December 31, | |
| --- | --- | --- |
| | **2016** | **2015** |
| **Assets** | | |
| Current assets: | | |
| Cash and cash equivalents | $              8,895 | $           15,885 |
| Short term investments | 2,754 | 3,254 |
| Accounts receivable, net | 6,964 | 5,875 |
| Federal income tax receivable | 169 | 545 |
| Prepaid expenses | 521 | 511 |
| Total current assets | 19,303 | 26,070 |
| Property and equipment, net | 456 | 498 |
| Long term investments | 12,779 | - |
| Capitalized software development costs | 3,743 | 3,982 |

|                                           |    |          |    |          |
|-------------------------------------------|----|----------|----|----------|
| Goodwill                                  |    | 12,712   |    | 12,712   |
| Deferred tax asset                        |    | 942      |    | 940      |
| Other assets                              |    | 245      |    | 60       |
| Total assets                              | $  | 50,180   | $  | 44,262   |

**Liabilities and Stockholders' Equity**

Current liabilities:

|                                           |    |          |    |          |
|-------------------------------------------|----|----------|----|----------|
| Accounts payable                          | $  | 876      | $  | 839      |
| Accrued expenses                          |    | 1,836    |    | 1,893    |
| Deferred revenue                          |    | 13,655   |    | 12,460   |
| Total current liabilities                 |    | 16,367   |    | 15,192   |
|                                           |    |          |    |          |
| Deferred revenue, non-current portion     |    | 3,790    |    | 3,808    |
| Other long term liabilities               |    | 147      |    | 134      |
| Commitments and contingencies             |    |          |    |          |

Stockholders' equity:

|                                                                                                                                                 |    |          |    |          |
|-------------------------------------------------------------------------------------------------------------------------------------------------|----|----------|----|----------|
| Preferred stock, par value $0.001 per share, 10,000,000 authorized, no shares issued or outstanding                                              |    | -        |    | -        |
| Common stock, par value $0.001 per share, 40,000,000 authorized, 21,920,912 and 21,303,467 shares issued at December 31, 2016 and December 31, 2015, respectively |    | 22       |    | 21       |
| Additional paid-in capital                                                                                                                       |    | 21,650   |    | 19,583   |
| Treasury stock, 403,581 shares, at cost, at December 31, 2016 and December 31, 2015                                                              |    | (1,452)  |    | (1,452)  |
| Retained earnings                                                                                                                                |    | 9,656    |    | 6,976    |
| Total stockholders' equity                                                                                                                       |    | 29,876   |    | 25,128   |
| Total liabilities and stockholders' equity                                                                                                       | $  | 50,180   | $  | 44,262   |

The accompanying notes are an integral part of these consolidated financial statements.

**GlobalSCAPE, Inc.**

**Consolidated Statements of Operations and Comprehensive Income**

(in thousands, except per share amounts)

**For the Year Ended December 31,**

|                                              | 2016       | 2015       |
| -------------------------------------------- | ---------- | ---------- |
| Operating revenues:                          |            |            |
| Software licenses                            | $   11,984 | $   12,023 |
| Maintenance and support                      | 18,668     | 16,489     |
| Professional services                        | 2,684      | 2,223      |
| Total revenues                               | 33,336     | 30,735     |
| Costs of revenues                            |            |            |
| Software licenses                            | 3,110      | 2,428      |
| Maintenance and support                      | 1,541      | 1,466      |
| Professional services                        | 1,671      | 1,394      |
| Total costs of revenues                      | 6,322      | 5,288      |
| Gross Profit                                 | 27,014     | 25,447     |
| Operating expenses                           |            |            |
| Sales and marketing                          | 11,682     | 10,406     |
| General and administrative                   | 6,975      | 6,168      |
| Research and development                     | 2,539      | 2,562      |
| Total operating expenses                     | 21,196     | 19,136     |
| Income from operations                       | 5,818      | 6,311      |
| Other income (expense):                      |            |            |
| Interest expense                             |            | (4)        |
| Interest income                              | 159        | 82         |
| Total other income (expense)                 | 159        | 78         |
| Income before income taxes                   | 5,977      | 6,389      |
| Provision for income taxes                   | 2,026      | 1,861      |
| Net income                                   | $    3,951 | $    4,528 |
| Comprehensive income                         | $    3,951 | $    4,528 |
| Net income per common share - basic          | $     0.19 | $     0.22 |
| Net income per common share - diluted        | $     0.18 | $     0.21 |
| Weighted average shares outstanding:         |            |            |
| Basic                                        | 21,126     | 20,824     |
| Diluted                                      | 21,677     | 21,366     |

****

16

**GlobalSCAPE, Inc.**
**Consolidated Statements of Cash Flows**
(in thousands)

| | For the Year Ended December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Operating Activities: | | |
| Net income | $ 3,951 | $ 4,528 |
| Adjustments to reconcile net income to net cash provided by operating activities | | |
| Bad debt expense | 72 | 62 |
| Depreciation and amortization | 2,045 | 1,553 |
| Stock-based compensation | 973 | 647 |
| Deferred taxes | (2) | (248) |
| Excess tax deficiency from exercise of share based compensation | 24 | (58) |
| Subtotal before changes in operating assets and liabilities | 7,063 | 6,484 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (1,161) | 1 |
| Prepaid expenses | (10) | (23) |
| Federal income taxes | 352 | (233) |
| Accrued interest receivable | (163) | (69) |
| Other assets | (185) | 40 |
| Accounts payable | 37 | (272) |
| Accrued expenses | (58) | 303 |
| Deferred revenues | 1,178 | 708 |
| Other long-term liabilities | 13 | 82 |
| Net cash provided by (used in) operating activities | 7,066 | 7,021 |
| Investing Activities: | | |
| Software development costs | (1,538) | (1,967) |
| Purchase of property and equipment | (226) | (152) |
| Purchase of certificates of deposit | (12,116) | - |
| Net cash provided by (used in) investing activities | (13,880) | (2,119) |
| Financing Activities: | | |
| Proceeds from exercise of stock options | 1,119 | 508 |
| Tax deficiency (benefit) from stock-based compensation | (24) | 58 |
| Dividends paid | (1,271) | (941) |
| Net cash provided by (used in) financing activities | (176) | (375) |
| Net increase (decrease) in cash | (6,990) | 4,527 |
| Cash at beginning of period | 15,885 | 11,358 |

| | | | |
|---|---|---|---|
| Cash at end of period | $ | 8,895 | $ | 15,885 |

| | | | |
|---|---|---|---|
| Supplemental disclosure of cash flow information: | | | | |
| Cash paid during the period for: | | | | |
| Interest | $ | - | $ | - |
| Income taxes | $ | 1,638 | $ | 2,146 |

43.     The Company's March 27, 2017 Form 10-K was signed by each of the Individual Defendants, and falsely represented that GlobalSCAPE's revenue for fiscal 2016 was $33.3 million when, in fact, revenue was only $32.5 million. Specifically, the Form 10-K falsely represented that licensing revenue derived from its central EFT platform product was $11.9 million when, in fact, licensing revenue was only $11.2 million. The Form 10-K also falsely represented that accounts receivable were $6.9 million when, in fact, accounts receivable were only $6.2 million. Additional false representations in the Form 10-K include net-income reported at $3.9 million, and earnings per share reported at $0.19. In fact, net-income was only $3.5 million, an overstatement of 10%. Likewise, earnings per share were only $.017, and were thus overstated by 10%.

44.     Moreover, the Form 10-K attributed GlobalSCAPE's 5% increase in license revenue from its EFT platform product to its decision to focus the Company's resources on developing the EFT platform product. In the Restatement, the Company admitted that licensing revenue from its EFT platform product actually *decreased* by 2%. Thus, by falsely reporting overstated licensing revenue, GlobalSCAPE misled investors regarding the merits of the Company's decision to shift the focus of its resources toward developing its EFT platform product.

45.     The Company's March 27, 2017 Form 10-K also falsely assured investors of the effectiveness of the Company's internal control over financial reporting:

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures designed to ensure that information required to be disclosed in reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our President and Chief Executive Officer and our Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

No system of controls, no matter how well designed and operated, can provide absolute assurance that the objectives of the system of controls are met. No evaluation of controls can provide absolute assurance that the system of controls has operated effectively in all cases. Our disclosure controls and procedures are designed to provide reasonable assurance that the objectives of disclosure controls and procedures are met.

As of the end of the period covered by this report, our President and Chief Executive Officer and Chief Financial Officer evaluated, with the participation of management, the effectiveness of our disclosure controls and procedures. Based on the evaluation, our President and Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective to provide reasonable assurance that the objectives of disclosure controls and procedures are met.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rules 13a-15(f) and 15d-15(f). Under the supervision and with the participation of our management, including our President and Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2016, based on the framework in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 (COSO). Based on that evaluation, our management concluded that our internal control over financial reporting was effective as of December 31, 2016.

This annual report does not include an attestation report of our independent registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to audit by our independent registered public accounting firm pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act signed into law on July 21, 2010, that permits us to provide only management's report in this annual report.

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting during the year ended December 31, 2016, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

46.     The Company's March 27, 2017 Form 10-K was signed by Defendants Albrecht and Goulet and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Albrecht and Goulet, who each certified:

1.      I have reviewed this annual report on Form 10-K of GlobalSCAPE, Inc.;

2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

a)      designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal year that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)      all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

47.     As admitted in the Restatement, and as alleged herein, GlobalSCAPE did not have effective internal control over its financial reporting at the time the statements in ¶¶ 45-46, supra, were made.

48.     On April 27, 2017, the Company held an earnings conference call with investors to discuss first quarter 2017 financial results. During that call, Defendant Goulet made the following misrepresentations:

Most notably, in the 3 quarters since we refocused our sales and product development efforts on our core EFT platform, **our EFT license revenue has seen a 15% turnaround in relation to the prior 3 quarters preceding the change. These strong double-digit results are a clear and positive reinforcement of the changes we've made both from a sales and product perspective.** For those who may be new to the GlobalSCAPE story, when we made the leadership change last May, our first initiative was to reevaluate our company-wide priorities and opportunities. In doing so, we implemented a new strategic roadmap designed to focus our efforts on areas of our business that can provide not only the most immediate impact, but can also drive long-term profitable growth.

(emphasis added).

As discussed in ¶ 44, GlobalSCAPE admitted that its licensing revenue for its ETF platform was actually overstated by 7% for fiscal 2016. The overstatement of licensing revenue was limited to the fourth quarter of 2016. Thus, Defendant Goulet falsely informed investors that licensing revenue from the EFT platform saw a 15% increase compared to the prior three quarters. Defendant Goulet also misled investors by stating that the numbers were a "clear and positive reinforcement" of the decision to shift GlobalSCAPE's focus toward its EFT platform. Defendant Albrecht was also on the call and failed to correct the misstatements.

49.     As noted, the Audit Committee begain investigating the bogus sales transaction in May 2017.

50.     On May 12, 2017, GlobalSCAPE filed with the SEC its quarterly report on Form 10-Q for the three month period ended March 31, 2017, providing, among other things, the Company's consolidated financial results for that period. On May 26, 2017, the Company filed on Form 10-Q/A an amended quarterly statement for the same period to correct a "typograophical error caus[ing] the individual line item amounts in non-current assets as of December 31, 2016, to be improperly matched with their respective descriptions," and reporting the Company's purportedly corrected consolidated financial results for that period, including among other things, its accounts receivable, revenues, assets, and stockholder equity:

### GlobalSCAPE, Inc.
### Condensed Consolidated Balance Sheets
(in thousands except share amounts)

|  | 2017 (Unaudited) | | 2016 (Audited) |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ | 10,400 | $ 8,895 |
| Short term certificates of deposit | | 2,759 | 2,754 |
| Accounts receivable, net | | 5,499 | 6,964 |

| | | | | |
|---|---|---:|---|---:|
| Federal income tax receivable | | - | | 169 |
| Prepaid and other expenses | | 492 | | 521 |
| Total current assets | | 19,150 | | 19,303 |
| | | | | |
| Long term certificates of deposit | | 12,837 | | 12,779 |
| Capitalized software development costs, net | | 3,731 | | 3,743 |
| Goodwill | | 12,712 | | 12,712 |
| Deferred tax asset, net | | 1,190 | | 942 |
| Property and equipment, net | | 577 | | 456 |
| Other assets | | 64 | | 245 |
| Total assets | $ | 50,261 | $ | 50,180 |

**Liabilities and Stockholders' Equity**

Current liabilities:

| | | | | |
|---|---|---:|---|---:|
| Accounts payable | $ | 657 | $ | 876 |
| Accrued expenses | | 1,928 | | 1,836 |
| Income tax payable | | 474 | | - |
| Deferred revenue | | 12,704 | | 13,655 |
| Total current liabilities | | 15,763 | | 16,367 |
| | | | | |
| Deferred revenue, non-current portion | | 3,618 | | 3,790 |
| Other long term liabilities | | 163 | | 147 |

Commitments and contingencies

Stockholders' equity:

| | | | | |
|---|---|---:|---|---:|
| Preferred stock, par value $0.001 per share, 10,000,000 authorized, no shares issued or outstanding | | - | | - |
| Common stock, par value $0.001 per share, 40,000,000 authorized, 21,970,412 and 21,920,912 shares issued at March 31, 2017, and December 31, 2016, respectively | | 22 | | 22 |
| Additional paid-in capital | | 22,064 | | 21,650 |
| Treasury stock, 403,581 shares, at cost, at March 31, 2017 and December 31, 2016 | | (1,452) | | (1,452) |
| Retained earnings | | 10,083 | | 9,656 |
| Total stockholders' equity | | 30,717 | | 29,876 |
| Total liabilities and stockholders' equity | $ | 50,261 | $ | 50,180 |

The accompanying notes are an integral part of these consolidated financial statements.

**GlobalSCAPE, Inc.**

**Condensed Consolidated Statements of Operations and Comprehensive Income**

(In thousands, except per share amounts)

*(Unaudited)*

| | | Three months ended March 31, | | |
| --- | --- | --- | --- | --- |
| | | 2017 | | 2016 |
| Operating Revenues: | | | | |
| Software licenses | $ | 2,464 | $ | 2,299 |
| Maintenance and support | | 5,121 | | 4,446 |
| Professional services | | 733 | | 642 |
| Total Revenues | | 8,318 | | 7,387 |
| Cost of revenues | | | | |
| Software licenses | | 736 | | 630 |
| Maintenance and support | | 412 | | 394 |
| Professional services | | 377 | | 422 |
| Total cost of revenues | | 1,525 | | 1,446 |
| Gross profit | | 6,793 | | 5,941 |
| Operating expenses | | | | |
| Sales and marketing | | 3,330 | | 3,048 |
| General and administrative | | 1,721 | | 1,733 |
| Research and development | | 739 | | 627 |
| Total operating expenses | | 5,790 | | 5,408 |
| Income from operations | | 1,003 | | 533 |
| Other income | | 70 | | 33 |
| Income before income taxes | | 1,073 | | 566 |
| Income tax expense | | 322 | | 174 |
| Net income | $ | 751 | $ | 392 |
| Comprehensive income | $ | 751 | $ | 392 |
| | | | | |
| Net income per common share - | | | | |
| Basic | $ | 0.03 | $ | 0.02 |
| Diluted | $ | 0.03 | $ | 0.02 |
| | | | | |
| Weighted average shares outstanding: | | | | |
| Basic | | 21,544 | | 21,033 |
| Diluted | | 22,023 | | 21,652 |
| | | | | |
| Cash dividends declared per share | $ | 0.015 | $ | 0.015 |

The accompanying notes are an integral part of these consolidated financial statements.

**GlobalSCAPE, Inc.**
**Condensed Consolidated Statements of Cash Flows**

(in thousands)
*(Unaudited)*

|  | For the Three Months Ended March 31, | |
|---|---|---|
|  | 2017 | 2016 |
| **Operating Activities:** | | |
| Net income | $ 751 | $ 392 |
| Items not involving cash at the time they are recorded in the statement of operations: | | |
| Provision for sales returns and doubtful accounts receivable | 11 | 43 |
| Depreciation and amortization | 541 | 501 |
| Share-based compensation | 324 | 222 |
| Deferred taxes | (248) | (19) |
| Excess tax benefit from share-based compensation | - | (3) |
| Subtotal before changes in operating assets and liabilities | 1,379 | 1,136 |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 1,454 | 916 |
| Prepaid expenses | 29 | 34 |
| Deferred revenue | (1,123) | (416) |
| Accounts payable | (219) | (350) |
| Accrued expenses | 92 | (272) |
| Other assets | 181 | 22 |
| Accrued interest receivable | (63) | (16) |
| Other long-term liabilities | 16 | 3 |
| Income tax receivable and payable | 643 | 150 |
| Net cash provided by operating activities | 2,389 | 1,207 |
| **Investing Activities:** | | |
| Software development costs capitalized | (462) | (488) |
| Purchase of property and equipment | (188) | (90) |
| Net cash (used in) investing activities | (650) | (578) |
| **Financing Activities:** | | |
| Proceeds from exercise of stock options | 90 | 122 |
| Excess tax benefit from share-based compensation | - | 3 |
| Dividends paid | (324) | (315) |
| Net cash (used in) financing activities | (234) | (190) |
| Net increase in cash | 1,505 | 439 |
| Cash at beginning of period | 8,895 | 15,885 |
| Cash at end of period | $ 10,400 | $ 16,324 |

Supplemental disclosure of cash flow information:
    Cash paid during the period for:

| | | | |
|---|---|---|---|
| Interest | $ | - | $ | - |
| Income taxes | $ | 15 | $ | 22 |

51.     GlobalSCAPE's May 26, 2017 Form 10-Q/A also assured investors of the effectiveness of GlobalSCAPE's internal control over financial reporting:

**Item 4. Controls and Procedures**

As of the end of the period covered by this report, our President and Chief Executive Officer and our Chief Financial Officer carried out an evaluation of the effectiveness of GlobalSCAPE's "disclosure controls and procedures" (as defined in the Securities Exchange Act of 1934 Rules 13a-15(e) and 15d-15(e)) and concluded that the disclosure controls and procedures were effective.

There were no changes in our internal controls over financial reporting during the three months ended March 31, 2017, that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

52.     GlobalSCAPE's May 12, 2017 Form 10-Q, and its May 26, 2017 Form 10-Q/A, were signed by each of the Individual Defendants and contained SOX certifications, signed by Albrecht and Goulet, substantially similar to the certifications described in ¶ 46, *supra*. The May 12, 2017 10-Q and the May 26, 2017 Form 10-Q/A omit to disclose any information regarding the Audit Committee's investigation into the bogus sales transaction.

53.     As admitted in the Restatement, and as alleged herein, GlobalSCAPE did not have effective control over its financial reporting at the time these statements were made.

## C.   *The Truth Emerges – Disclosures At The End Of The Class Period*

54.     On August 7, 2017, after the markets had closed, the Company issued a press release and filed the same on Form 8-K with the SEC, entitled "GlobalSCAPE, Inc. Announces Internal Investigation and Financial Restatement," providing, in pertinent part:

GlobalSCAPE, Inc. (NYSE MKT: GSB), a worldwide leader in the secure movement and integration of data, today announced that the Audit Committee of the Board of Directors, comprised entirely of independent directors, has been conducting an investigation into certain transactions in the fourth quarter

of 2016 involving improper arrangements with customers that circumvented the Company's internal controls and their potential effect on previously reported revenue. The Audit Committee is being advised by outside counsel and assisted by forensic accounting advisors.

Based on the results of the investigation to date, the improper arrangements with customers that circumvented the Company's internal controls have the effect of overstating the reported amounts of accounts receivable as of December 31, 2016, and license revenue for the three months and year ended December 31, 2016, by approximately $403,000 and $396,000, respectively. GlobalSCAPE's revenue for fiscal 2016 as previously reported and before the effects of this matter was $33.3 million. The effects of the improper arrangements with customers that circumvented the Company's internal controls on the Company's consolidated financial statements for the year ended and as of December 31, 2016 and the three months ended and as of March 31, 2017 are presented in the tables immediately following this press release.

As a result of these developments, the Company has taken and is taking steps to remediate the issues that were raised in the investigation.

The Company also announced that it intends to effect a restatement of its previously issued financial statements through filing an amended Annual Report on Form 10-K for the year ended December 31, 2016 and an amended Quarterly Report on Form 10-Q for the quarter ended March 31, 2017. The Company is working diligently and as expeditiously as possible to prepare and file these amended reports.

As further disclosed in a contemporaneous 8-K filed with the Securities and Exchange Commission, the Company announced the retention of Weaver and Tidwell as its independent registered public accounting firm to audit the Company's financial statements.

**GlobalSCAPE, Inc.**
**Consolidated Balance Sheet**
**December 31, 2016**
**(in thousands except per share amounts)**

This schedule illustrates the current and preliminary estimate by GlobalSCAPE, Inc. of adjustments relating to errors discovered to date with respect to arrangements with customers that have been the subject of the investigation being conducted by the Audit Committee as described in the attached press release.

Download Similar TablesLink

| | **Previously Reported** | **Adjustment** | **Restated (Unaudited)** |
|---|---|---|---|
| Assets | | | |

| | | | | | |
|---|---|---|---|---|---|
| Current assets: | | | | | |
| Cash and cash equivalents | $ | 8,895 | - | $ | 8,895 |
| Short term investments | | 2,754 | - | | 2,754 |
| Accounts receivable, net | | 6,964 | (403) | | 6,561 |
| Federal income tax receivable | | 169 | 111 | | 280 |
| Prepaid and other expenses | | 521 | - | | 521 |
| Total current assets | | 19,303 | (292) | | 19,011 |
| | | | | | |
| Long term investments | | 12,779 | - | | 12,779 |
| Property and equipment, net | | 456 | - | | 456 |
| Capitalized software development costs, net | | 3,743 | - | | 3,743 |
| Goodwill | | 12,712 | - | | 12,712 |
| Deferred tax asset, net | | 942 | - | | 942 |
| Other assets | | 245 | - | | 245 |
| Total assets | $ | 50,180 | $ (292) | $ | 49,888 |
| | | | | | |
| Liabilities and Stockholders' Equity | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ | 876 | $ (42) | $ | 834 |
| Accrued expenses | | 1,836 | (33) | | 1,803 |
| Deferred revenue | | 13,655 | - | | 13,655 |
| Income taxes payable | | - | - | | - |
| Total current liabilities | | 16,367 | (75) | | 16,292 |
| | | | | | |
| Deferred revenue, non-current portion | | 3,790 | - | | 3,790 |
| Other long term liabilities | | 147 | - | | 147 |
| | | | | | |
| Stockholders' Equity: | | | | | |
| Preferred stock, par value $0.001 per share, 10,000,000 shares authorized, no shares issued or outstanding | | - | - | | - |

| | | | | | |
|---|---|---|---|---|---|
| Common stock, par value $0.001 per share, 40,000,000 shares authorized, 21,920,912 shares issued | | 22 | | - | 22 |
| Additional paid-in capital | | 21,650 | | - | 21,650 |
| Treasury stock, 403,581 shares, at cost | | (1,452) | | - | (1,452) |
| Retained earnings | | 9,656 | | (217) | 9,439 |
| Total stockholders' equity | $ | 29,876 | $ | (217) $ | 29,659 |
| Total liabilities and stockholders' equity | $ | 50,180 | $ | (292) $ | 49,888 |

### GlobalSCAPE, Inc.
### Consolidated Statement of Operations and Comprehensive Income
### For the Year Ended December 31, 2016
### (in thousands, except per share amounts)

This schedule illustrates the current and preliminary estimate by GlobalSCAPE, Inc. of adjustments relating to errors discovered to date with respect to arrangements with customers that have been the subject of the investigation being conducted by the Audit Committee as described in the attached press release.

| | Previously Reported | | Adjustment | | Restated (Unaudited) |
|---|---|---|---|---|---|
| Operating revenues: | | | | | |
| Software licenses | $ | 11,984 | $ | (396) $ | 11,588 |
| Maintenance and support | | 18,668 | | - | 18,668 |
| Professional services | | 2,684 | | - | 2,684 |
| Total revenues | | 33,336 | | (396) | 32,940 |
| Costs of revenues | | | | | |
| Software licenses | | 3,110 | | (42) | 3,068 |
| Maintenance and support | | 1,541 | | - | 1,541 |
| Professional services | | 1,671 | | - | 1,671 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Total costs of revenues | | 6,322 | | (42) | | 6,280 |
| Gross profit | | 27,014 | | (354) | | 26,660 |
| Operating expenses | | | | | | |
| Sales and marketing | | 11,682 | | (26) | | 11,656 |
| General and administrative | | 6,975 | | - | | 6,975 |
| Research and development | | 2,539 | | - | | 2,539 |
| Total operating expenses | | 21,196 | | (26) | | 21,170 |
| Income from operations | | 5,818 | | (328) | | 5,490 |
| Other income | | 159 | | - | | 159 |
| Income before income taxes | | 5,977 | | (328) | | 5,649 |
| Income tax expense | | 2,026 | | (111) | | 1,915 |
| Net income | $ | 3,951 | $ | (217) | $ | 3,734 |
| Comprehensive income | $ | 3,951 | $ | (217) | $ | 3,734 |
| | | | | | | |
| Net income per common share: | | | | | | |
| Basic | $ | 0.19 | $ | (0.01) | $ | 0.18 |
| Diluted | $ | 0.18 | $ | (0.01) | $ | 0.17 |
| | | | | | | |
| Weighted average shares outstanding: | | | | | | |
| Basic | | 21,126 | | 21,126 | | 21,126 |
| Diluted | | 21,677 | | 21,677 | | 21,677 |
| | | | | | | |
| Cash dividends declared per share | $ | 0.06 | $ | - | $ | 0.06 |

**GlobalSCAPE, Inc.**
**Consolidated Statement of Cash Flows**
**For the Year Ended December 31, 2016**
**(in thousands)**

This schedule illustrates the current and preliminary estimate by GlobalSCAPE, Inc. of adjustments relating to errors discovered to date with respect to arrangements with customers that have been the subject of the investigation being conducted by the Audit Committee as described in the attached press release.

| | Previously Reported | Adjustment | |
|---|---|---|---|
| Operating Activities: | | | |
| Net income | $ 3,951 | (217) $ | 3,734 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Bad debt expense | 72 | - | 72 |
| Depreciation and amortization | 2,045 | - | 2,045 |
| Stock-based compensation | 973 | - | 973 |
| Deferred taxes | (2) | - | (2) |
| Excess tax deficiency from exercise of share based compensation | 24 | - | 24 |
| Subtotal before changes in operating assets and liabilities | 7,063 | (217) | 6,846 |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | (1,161) | 403 | (758) |
| Prepaid expenses | (10) | - | (10) |
| Federal income taxes | 352 | (111) | 241 |
| Accrued interest receivable | (163) | - | (163) |
| Other assets | (185) | - | (185) |
| Accounts payable | 37 | (42) | (5) |
| Accrued expenses | (58) | (33) | (91) |
| Deferred revenues | 1,178 | - | 1,178 |
| Other long-term liabilities | 13 | - | 13 |
| Net cash provided by (used in) operating activities | 7,066 | - | 7,066 |
| Investing Activities: | | | |
| Software development costs | (1,538) | - | (1,538) |
| Purchase of property and equipment | (226) | - | (226) |
| Purchase of certificates of deposit | (12,116) | - | (12,116) |

| | | | | | | |
|---|---|---|---|---|---|---|
| Net cash provided by (used in) investing activities | | (13,880) | | - | | (13,880) |
| Financing Activities: | | | | | | |
| Proceeds from exercise of stock options | | 1,119 | | - | | 1,119 |
| Tax deficiency (benefit) from stock-based compensation | | (24) | | - | | (24) |
| Dividends paid | | (1,271) | | - | | (1,271) |
| Net cash provided by (used in) financing activities | | (176) | | - | | (176) |
| Net increase (decrease) in cash | | (6,990) | | - | | (6,990) |
| Cash at beginning of period | | 15,885 | | - | | 15,885 |
| Cash at end of period | $ | 8,895 | $ | - | $ | 8,895 |
| Supplemental disclosure of cash flow information: Cash paid during the period for: | | | | | | |
| Interest | $ | - | $ | - | $ | - |
| Income taxes | $ | 1,638 | $ | - | $ | 1,638 |

55.     The contemporaneously-filed 8-K, filed on August 7, 2017 (the "August 7 8-K")
further disclosed that the Company had dismissed its independent registered public accounting
firm, BDO and hired Weaver and Tidwell, L.L.P. as its replacement. As discussed below in ¶ 74,
it appears that GlobalSCAPE fired BDO because BDO believed GlobalSCAPE may have been
engaging in illegal acts and because Mann and the entire Audit Committee would not replace its
non-independent counsel that was conducting the internal investigation.

56.     RSM was GlobalSCAPE's outside auditor prior to their dismissal on March 31,
2017. RSM had issued clean audit opinions concerning GlobalSCAPE's 2016 year-end financial
results and RSM was re-engaged to reissue its audit report for the year end December 31, 2016
financial results after GlobalSCAPE revealed that those results would have to be restated.

57.     On November 24, 2017, however, after the market closed, the Company disclosed on Form 8-K (the "November 24 8-K") filed with the SEC, that RSM was "withdrawing from its engagement" to re-audit and re-issue the 2016 year end results. Specifically, the Company stated that "based on the information the Audit Committee provided from its investigation, RSM had concluded that, in its professional judgment, it could no longer rely on management's representations, which the Company has concluded is a 'reportable event' as defined in item 304(a)(1)(v) of Regulation S-K."

58.     This announcement provided further information aboud the breadth and depth of wrongdoing at GlobalSCAPE to the market, and caused GlobalSCAPE shares to further decline, as explained herein.

### D. Defendants' Statements and Omissions During the Class Period Were Knowingly or Recklessly False and Misleading When Made

59.     As alleged herein, the admissions in the Restatement, coupled with information from the Company's dismissed independent registered public accounting firm, along with details gleaned from federal investigations, provides a strong inference that the statements identified above (Section B) were either knowingly or recklessly false and misleading when made. Thus, GlobalSCAPE issued financial statements throughout the Class Period that were materially false and misleading when issued, they omitted from disclosure material facts necessary in order to make the statements made not misleading, and those statements were made either with knowledge or in reckless disregard for the truth.

60.     As revealed in the restated financials filed on June 14, 2018, the Company: (1) improperly recognized revenue relating to transactions that did not meet the Company's criteria in order for them to be recognized as revenue; (2) overstated accounts receivable; and (3) failed to maintain adequate internal controls over financial reporting.

61.     Defendants' brazen disregard for GlobalSCAPE's lack of adequate internal controls resulted in a material impact on key financial metrics such as revenue, net income and earnings per share. Specifically, as detailed herein, the Restatement revealed that revenue was overstated by $741,000 and accounts receivable by $676,000. Similarly, the Restatement revealed that the Company overstated net-income and earnings per share by 10% during 2016. Such significant adjustments to the Company's financials, all occurring during the fourth quarter of 2016 on the heels of disappointing second and third quarters, demonstrate the significance of the fraud carried out by Defendants.

**The Restatement Had a Material Impact on GlobalSCAPE's Financial Statements**

62.     The Restatement had a material impact on the Company's financial statements – specifically revenue, and as a result, net-income and earnings per share. As revenue is the essence of profitability, it is a metric that is closely watched by analysts and investors alike in order to assess a company's performance and prospects. Net-income is a direct result of revenue, and, thus, changes in revenue materially impact a company's stock price. Likewise, accounts receivable is of great importance as it, by creating cash flows, indicates the financial health and flexibility of a company.

63.     The following table calculates the percent reduction in revenue from software licensing:

| Fiscal Period (*numbers in thousands*) | Licensing Revenue As Originally Stated | Restatement Reduction To Licensing Revenue | Restated Licensing Revenue | % Reduction To Licensing Revenue |
|---|---|---|---|---|
| 2016 | $11,984 | $741 | $11,243 | **6.2%** |

64.     The following table calculates the percent reduction on accounts receivable:

| Fiscal Period (*numbers in thousands*) | Accounts Receivable As Originally Stated | Restatement Reduction To Accounts Receivable | Restated Accounts Receivable | % Reduction To Accounts Receivable |
|---|---|---|---|---|
| 2016 | $6,964 | $676 | $6,288 | **9.7%** |

65.    The following table calculates the percent reduction in net-income:

| Fiscal Period (*numbers in thousands*) | Net-Income As Originally Stated | Restatement Reduction To Net-Income | Restated Net-Income | % Reduction To Net-Income |
|---|---|---|---|---|
| 2016 | $3,951 | $366 | $3,585 | **9.3%** |

66.    Moreover, the Restatement had a material impact on earnings per share, as demonstrated in the table below:

| Fiscal Period | EPS As Originally Stated | Restatement Reduction To EPS | Restated EPS | % Reduction To EPS |
|---|---|---|---|---|
| 2016 | $0.19 | $0.02 | $0.17 | **10.5%** |

67.    Although the size of GlobalSCAPE's Restatement is relatively small, its impact is material. In a 1998 Speech, then SEC Chairman, Arthur Levitt, described "earnings management" as the consequence of issuers of financial reports seeking "to satisfy consensus earnings estimates and project a smooth earnings path" at the expense of faithful representation in financial reporting. *See* Remarks by Chairman Arthur Levitt, Securities and Exchange Commission, *The "Numbers Game,"* NYU Center for Law and Business, New York, N.Y., September 28, 1998. The SEC explained the potential for material impact due to seemingly small misstatements in its SEC Staff-Accounting Bulletin: No. 99 – Materiality, issued on August 12, 1999:

STAFF ACCOUNTING BULLETIN NO. 99

The staff hereby adds Section M to Topic 1 of the Staff Accounting Bulletin Series. Section M, entitled "Materiality," provides guidance in applying materiality thresholds to the preparation of financial statements filed with the Commission and the performance of audits of those financial statements.

# STAFF ACCOUNTING BULLETINS

## TOPIC 1: FINANCIAL STATEMENTS

\* \* \* \* \*

### M. Materiality

**1. Assessing Materiality**

**Facts**: During the course of preparing or auditing year-end financial statements, financial management or the registrant's independent auditor becomes aware of misstatements in a registrant's financial statements. When combined, the misstatements result in a 4% overstatement of net income and a $.02 (4%) overstatement of earnings per share. Because no item in the registrant's consolidated financial statements is misstated by more than 5%, management and the independent auditor conclude that the deviation from generally accepted accounting principles ("GAAP") is immaterial and that the accounting is permissible.

**Question**: Each Statement of Financial Accounting Standards adopted by the Financial Accounting Standards Board ("FASB") states, "The provisions of this Statement need not be applied to immaterial items." In the staff's view, may a registrant or the auditor of its financial statements assume the immateriality of items that fall below a percentage threshold set by management or the auditor to determine whether amounts and items are material to the financial statements?

**Interpretive Response**: No. The staff is aware that certain registrants, over time, have developed quantitative thresholds as "rules of thumb" to assist in the preparation of their financial statements, and that auditors also have used these thresholds in their evaluation of whether items might be considered material to users of a registrant's financial statements. One rule of thumb in particular suggests that the misstatement or omission of an item that falls under a 5% threshold is not material in the absence of particularly egregious circumstances, such as self-dealing or misappropriation by senior management. The staff reminds registrants and the auditors of their financial statements that exclusive reliance on this or any percentage or numerical threshold has no basis in the accounting literature or the law.

The use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that – without considering all relevant circumstances – a deviation of less than the specified percentage with respect to a particular item on the registrant's financial statements is unlikely to be material. The staff has no objection to such a "rule of thumb" as an initial step in assessing materiality. But quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations. **Materiality concerns the significance of an item to users of a registrant's financial statements. A matter is "material" if there is a substantial likelihood that a reasonable person would consider it important.** In its Statement of Financial Accounting Concepts No. 2, the FASB stated the essence of the concept of materiality as follows:

**The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.**

This formulation in the accounting literature is in substance identical to the formulation used by the courts in interpreting the federal securities laws. The Supreme Court has held that a fact is material if there is –

a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

Under the governing principles, an assessment of materiality requires that one views the facts in the context of the "surrounding circumstances," as the accounting literature puts it, or the "total mix" of information, in the words of the Supreme Court. In the context of a misstatement of a financial statement item, while the "total mix" includes the size in numerical or percentage terms of the misstatement, it also includes the factual context in which the user of financial statements would view the financial statement item. The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both "quantitative" and "qualitative" factors in assessing an item's materiality. Court decisions, Commission rules and enforcement actions, and accounting and auditing literature have all considered "qualitative" factors in various contexts.

The FASB has long emphasized that materiality cannot be reduced to a numerical formula. In its Concepts Statement No. 2, the FASB noted that some had urged it to promulgate quantitative materiality guides for use in a variety of situations. The FASB rejected such an approach as representing only a "minority view," stating –

The predominant view is that materiality judgments can properly be made only by those who have all the facts. The Board's present position is that no general standards of materiality could be formulated to take into account all the considerations that enter into an experienced human judgment.

The FASB noted that, in certain limited circumstances, the Commission and other authoritative bodies had issued quantitative materiality guidance, citing as examples guidelines ranging from one to ten percent with respect to a variety of disclosures. And it took account of contradictory studies, one showing a lack of uniformity among auditors on materiality judgments, and another suggesting widespread use of a "rule of thumb" of five to ten percent of net income. The FASB also considered whether an evaluation of materiality could be based solely on anticipating the market's reaction to accounting information.

The FASB rejected a formulaic approach to discharging "the onerous duty of making materiality decisions" in favor of an approach that takes into account all the relevant considerations. In so doing, it made clear that –

**[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.**

**Evaluation of materiality requires a registrant and its auditor to consider** *all* **the relevant circumstances, and the staff believes that there are numerous circumstances in which misstatements below 5% could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material; as stated in the auditing literature:**

As a result of the interaction of quantitative and qualitative considerations in materiality judgments, misstatements of relatively small amounts that come to the auditor's attention could have a material effect on the financial statements.

**Among the considerations that may well render material a quantitatively small misstatement of a financial statement item are –**

- whether the misstatement arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate
- **whether the misstatement masks a change in earnings or other trends**
- whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise
- whether the misstatement changes a loss into income or vice versa
- **whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability**
- whether the misstatement affects the registrant's compliance with regulatory requirements
- whether the misstatement affects the registrant's compliance with loan covenants or other contractual requirements
- whether the misstatement has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation
- **whether the misstatement involves concealment of an unlawful transaction.**

This is not an exhaustive list of the circumstances that may affect the materiality of a quantitatively small misstatement. Among other factors, the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material. Consideration of potential market reaction to disclosure of a misstatement is by itself "too blunt an instrument to be depended on" in considering whether a fact is material. When, however, management or the independent auditor expects (based, for example, on a pattern of market performance) that a known misstatement may result in a significant positive or negative market reaction, that expected reaction should be taken into account when considering whether a misstatement is material.

For the reasons noted above, the staff believes that a **registrant and the auditors of its financial statements should not assume that even small intentional misstatements in financial statements, for example those pursuant to actions to "manage" earnings, are**

**immaterial**. While the intent of management does not render a misstatement material, it may provide significant evidence of materiality. The evidence may be particularly compelling where management has intentionally misstated items in the financial statements to "manage" reported earnings. In that instance, it presumably has done so believing that the resulting amounts and trends would be significant to users of the registrant's financial statements. The staff believes that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings. Investors presumably also would regard as significant an accounting practice that, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.

The materiality of a misstatement may turn on where it appears in the financial statements. For example, a misstatement may involve a segment of the registrant's operations. In that instance, in assessing materiality of a misstatement to the financial statements taken as a whole, registrants and their auditors should consider not only the size of the misstatement but also the significance of the segment information to the financial statements taken as a whole. **"A misstatement of the revenue and operating profit of a relatively small segment that is represented by management to be important to the future profitability of the entity" is more likely to be material to investors than a misstatement in a segment that management has not identified as especially important**. In assessing the materiality of misstatements in segment information - as with materiality generally -

situations may arise in practice where the auditor will conclude that a matter relating to segment information is qualitatively material even though, in his or her judgment, it is quantitatively immaterial to the financial statements taken as a whole.

(emphasis added) (internal citations omitted).

68.     The materiality of GlobalSCAPE's misstatements is evidenced by the fact that EFT licensing revenue was "represented by management to be important to the future profitiablity of the entity." In its 10-K for fiscal 2016, GlobalSCAPE attributed its record-breaking fourth quarter in 2016 to the false EFT revenue. GlobalSCAPE reaffirmed the materiality of the EFT platform numbers on its April 26, 2017 earnings call, when Defendant Goulet touted the false EFT revenue as "a clear and positive reinforcement" of the decision to shift GlobalSCAPE's focus toward its EFT platform. Thus, while small, GlobalSCAPE's misstated revenue allowed the Company to present a false portrait of success to the investing public.

### Defendants Knowingly or Recklessly Disregarded GlobalSCAPE's Lack of Internal Controls

69.     In its restated 10-K/A, the Company admitted that it had re-evaluated "the effectiveness of our internal control over financial reporting as of December 31, 2016 using the criteria set forth in the *Internal Control – Integrated Framework (2013)* issued by the committee of Organizations of the Treadway Commission ("COSO")." As a result of this re-evaluation— employing the same COSO criteria used to evaluate and conclude that its internal control over financial reporting was effective in its original 10-K—the Company concluded:

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. In connection with our management's assessment of our internal control over financial reporting described above, our management has identified the following deficiencies that constituted individually, or in the aggregate, material weaknesses in our internal control over financial reporting as of December 31, 2016.

70.     Specifically, the Company admitted:

We had material weaknesses in our control environment and monitoring:

- We did not implement effective oversight of our finance and accounting processes (including organizational structure and reporting hierarchy), which impacted our ability to make appropriate decisions regarding revenue recognition.

- We did not effectively design and implement appropriate oversight controls over our period-end financial closing and reporting processes, and our review controls were not sufficient to ensure that errors regarding revenue recognition would be detected.

- We did not effectively monitor (review, evaluate and assess) the risks associated with key internal control activities that provide the revenue information contained in our consolidated financial statements.

We had material weaknesses related to internal control monitoring and activities to support the financial reporting process:

- We did not maintain effective controls over the invoicing process to ensure that proper supporting documentation was received prior to preparing invoices.

- We did not maintain effective controls over the revenue recognition process to ensure revenue was only recognized when all four criteria of our revenue recognition policy were met.

Because of these material weaknesses, our management has concluded that our internal control over financial reporting was not effective to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with GAAP as of December 31, 2016.

71.     As a result of the material weaknesses in internal controls, the Company admitted that revenue was improperly recognized due to the following:

- Transactions where the amounts of the sales were not fixed or determinable and collection of all or any portion of these amounts could not be reasonably assured;

- One invoice issued to a customer whereby certain of our operating personnel had been informed by the customer that its employee who placed the order was not authorized to do so and that the customer was not committing to complete the purchase in the absence of an approved authorization, which as a result meant that collection of all or any portion of this sale amount could not be reasonably assured;

- Transactions in which license activation keys did not appear to have been delivered to the customer in the period in which the sale was recorded;

- Transactions appearing to contain side deal terms negotiated with customers but not reflected in the underlying sales documentation;

- Transactions in which a sale was recorded although the customer had not yet responded to the Company's request to provide a commitment to purchase;

- Transactions in which a sale was made to a reseller whereby collection was not reasonably assured due to payment or other nonstandard terms not consistent with the Company's revenue recognition policy;

- Transactions in which there was either no purchase order or a purchase order dated after the date of the end of the period for which revenue had been previously recognized; and

- One transaction which included incorrect vendor specific objective evidence allocation.

72.     Similar disclosures regarding the Company's material weaknesses in internal controls were included in the Company's 10-Q/A. The Company concluded that its internal controls were not effective as of March 31, 2017.

73.     The Restatement, which identifies the internal control failures during the Class Period, is corroborated by BDO's 10A Letter and the federal investigations regarding GlobalSCAPE's need to restate its financial results.

74.     On August 1, 2017, the Company informed BDO that it had been dismissed as the Company's independent auditors. On August 2, 2017, the Company received the 10A Letter from BDO in accordance with Section 10A(b)(2) of the Exchange Act. Although the 10A Letter is not publicly available, the Company summarized its contents in the August 7 8-K as follows:

In the 10A Letter, BDO advised that on or around July 6, 2017 BDO was contacted by David Mann, the audit committee chairman of GlobalSCAPE, who provided information about conduct that in BDO's view indicated an illegal act, as defined by Section 10A of the Exchange Act, may have occurred. BDO stated in the 10A Letter that **BDO was informed that the Company had learned of the subject conduct in May of 2017 and had already engaged the Company's corporate outside counsel**, along with forensic accountants, to conduct and investigation into the conduct and that additional information would be provided as the investigation continued. In a separate communication to the audit committee chairman on July 6, 2017, BDO advised GlobalSCAPE of both its and BDO's obligations under Section 10A of the Exchange Act and auditing standards of the Public Company Accounting Oversight Board, and that **BDO would recommend that the audit committee engage independent counsel to conduct the investigation, which BDO defined as counsel who had not previously performed substantial work for the Company.** BDO communicated that it did not believe the counsel GlobalSCAPE had engaged met that definition due to GlobalSCAPE's historical working relationship with them.

BDO stated in the 10A Letter that **additional information** related to the conduct under investigation **was provided to BDO** by GlobalSCAPE's corporate outside counsel on July 10, 2017, **noting that employees of the Company had entered into "side agreements" with customers of the Company in December 2016 which increased revenue recorded, and accounts receivable**, by amounts that had not yet been fully quantified. BDO was engaged by GlobalSCAPE on April 12, 2017, and was not the Company's independent registered public accounting firm during the period in which the misconduct was alleged to have occurred.

BDO stated in the 10A Letter that in a discussion with GlobalSCAPE's audit committee chairman on July 10, 2017, BDO discussed its request for the Company to engage other counsel

to lead the investigation and was told that the Company considered the engaged counsel to be independent. BDO stated in the 10A Letter that during that discussion BDO detailed the reasons for its concern, and that **BDO viewed the Company's failure to engage alternate legal counsel as a failure to take timely and appropriate remedial action** as defined by Section 10A(b)(2)(B) of the Exchange Act, where absent action by the Company, BDO would not be in a position to assess the adequacy of the investigation, which BDO would consider a disagreement with the Company as it would limit the scope of BDO's audit, warranting either a departure from its standard report or resignation from the audit engagement. In the 10A Letter, BDO stated that since July 10, 2017, **in response to multiple requests by BDO, the audit committee retained their position that they would continue the investigation being performed by their corporate outside counsel**, who they believed were sufficiently independent.

In the 10A Letter, BDO stated its belief that **the Company has not been forthcoming with details regarding the investigation or the conclusions**, if any, reached by counsel and the Company about the conduct at issue. In the 10A Letter, BDO stated that due to the lack of details that BDO has been provided regarding the investigation, and its dismissal as the Company's independent registered accounting firm, it was unable to determine whether it is likely that an illegal act has occurred, and whether the impact of any misstatements resulting from the alleged misconduct had a material impact on the Company's consolidated financial statements. In the 10A Letter, BDO stated that based on the limited information BDO had been provided, **it believed that it is possible that the conduct could have had a material effect on the Company's consolidated financial statements** that have been filed with the Securities and Exchange Commission (the "SEC"), or that are expected to be filed in the foreseeable future. In the 10A Letter, BDO stated that it had been informed, but had not confirmed that, at its urging in its communications with the Company on July 6, 2017, the Company has advised its prior auditor of the investigation. In the 10A Letter, BDO also stated that **it does not believe senior management has taken timely and appropriate remedial action in response to the conduct, in particular by not having the investigation performed by counsel with no prior affiliation with the Company and by not sharing information from the investigation with BDO on a timely basis.** In the 10A Letter, BDO also stated that the failure to take timely and appropriate remedial action may have either warranted a departure from a standard report or **warranted BDO's resignation, had BDO not been terminated.**

(emphasis added).

75.    On March 16, 2018, GlobalSCAPE disclosed that in January of 2018, it had received a subpoena from the Forth Worth, Texas Regional Division of the SEC, and that the SEC had launched a formal investigation into the Company for issues relating to its need to restate the Company's financials.

76.     On May 18, 2018, the United States Attorney's Office for the Western District of

Texas filed a criminal information charging GlobalSCAPE's former Vice President of World Wide

Sales, Daniel Burke, with wire fraud. The criminal information provides:

> In mid-2016, Burke[2] was promoted to Vice President of [World Wide] Sales for GlobalSCAPE. **At the time Burke was promoted in 2016, GlobalSCAPE was lagging its internal forecasts for both bookings and revenue.** Burke felt pressure from within the company to attain projected numbers and growth targets. Burke was simply given "the number" and expected to hit it.

> Beginning in July 2016, Burke participated in weekly forecast meetings. Prior to his first meeting, Burke put together his first sales forecast, which was for the third quarter of 2016 and was significantly short of the projected targets previously established. **Upon reviewing Burke's updated projections, he was told that that he needed to change his numbers.** Burke changed his forecast to reflect the numbers previously budgeted, despite the fact that he believed those budgeted numbers were unattainable. Notably, **GlobalSCAPE missed projected targets for the third quarter of 2016, and Burke was told "that's your mulligan, you're not going to miss again."**

> **The financial results for the fourth quarter of 2016 were important to GlobalSCAPE because they would determine whether GlobalSCAPE met its annual growth targets. Further the company was seeking external investors for a potential major GlobalSCAPE share purchase in the first quarter of 2017.** Consequently, Burke was involved in discussions to meet targets. Burke and another person decided to pursue potential "stocking orders" to meet targets, and Burke began contacting select GlobalSCAPE channel customers. "Stocking orders" involved the pre-purchase of GlobalSCAPE software by resellers at significant price discount. Although GlobalSCAPE had booked small "stocking orders" in past quarters, Burke and others in the company were expecting a large revenue shortfall in the fourth quarter of 2016.

> By the end of the fourth quarter, Burke and another person worked to meet management's reduced revenue target. **Solely to meet this target, GlobalSCAPE booked last minute deals with two channel customers.** However, Burke and another person had significant doubts about the companies' ability to repay GlobalSCAPE in a timely manner since these resellers would likely have to pay GlobalSCAPE in full for these licenses prior to selling them to end users. Consequently, a plan was implemented to facilitate the companies' ability to repay GlobalSCAPE by diverting unrelated projected first quarter 2017 GlobalSCAPE revenues to the companies. These "side agreements" were discussed with the companies verbally and via e-mail, but were not included in the deal documents.

---

[2] The criminal information refers to Burke as "DANIEL LEE BURKE" and to GlobalSCAPE as "GSB." For consistency, they are referred to as "Burke" and "GlobalSCAPE." No other changes to the criminal information were made unless indicated by brackets.

At the end of the year, Burke was still short of his sales goals. In an effort to meet those sales goals, Burke contacted Company A for the purpose of entering into a sales agreement that would give him the final amount needed to meet GlobalSCAPE's sales goals. Company A was not able to finalize a sales agreement within the period for Burke to book the sale in the 2016 time period to allow him to credit the sale as part of GlobalSCAPE's fourth quarter sales goal for 2016. Burke took it upon himself to create and make false material representations in a letter purchase order in the name of Company A indicating that a sale had occurred when, in fact, no such sale had occurred.

By this means, Burke was able to ingratiate himself with his superiors at GlobalSCAPE and ensure that he would continue to be employed by the company. Burke received a sales commission for booking the bogus transaction with Company A.

(emphasis added).

77.     The criminal information further provides that Burke sent the false purchase order to a GlobalSCAPE executive in San Antonio on December 30, 2016; that GlobalSCAPE reversed the recognized revenue from the associated transaction, but not before the amount had been improperly included for revenue for 2016, making it appear that GlobalSCAPE met its sales goals; and that the fraudulent figures were included on GlobalSCAPE's 10-K for 2016, which was filed and signed by Defendants Goulet and Albrecht.

78.     On May 31, 2018, Burke pled guilty to the criminal information in the United States District Court for the Western District of Texas, San Antonio Division before the Honorable Fred Biery. At Burke's plea hearing, Assistant United States Attorney Greg Surovic informed the court regarding the illegal activity at GlobalSCAPE, "Your Honor, **this is a continuing investigation. . . . There's more to be found out. And Mr. Burke is just the first person to come in**." (emphasis added).

79.     Also on May 31, 2018, a Grand Jury sitting in the Western District of Texas served GlobalSCAPE with a subpoena—seeking all documents and emails relating to the Company's internal investigation that led to the Restatement.

45

80.     Thus, as admitted in the Restatement, the Company did not even have proper controls in place to prevent the recognition of improper sales, including at least one outright fraudulent sale. Defendants either knew, or recklessly disregarded, that GlobalSCAPE's internal controls were woefully inadequate and insufficient.

81.     Burke's "superiors" at GlobalSCAPE were defendants Goulet, Albrecht, Brown, and Mann and the criminal information alleges that Burke booked the phony sale "to ingratiate himself with his superiors" and because he felt the pressure to meet the numbers so Brown and Mann's stock sale could occur. It is reasonable to infer that these Defendants pressured Burke to create the phony sale.

82.     The fourth quarter was important to GlobalSCAPE as it would determine whether the Company met its annual growth targets and because the Company was seeking external investors for a potential major purchase of GlobalSCAPE's stock in the first quarter of 2017. The Company held discussions regarding meeting targets.

83.     Defendants Goulet and Albrecht were well aware of the Company's failures in meeting projected targets in previous quarters. It is inconceivable that Defendants could have honestly certified during the Class Period that GlobalSCAPE's internal financial controls were adequate where the Company failed to detect (or chose to ignore) a series of improper eleventh-hour sales, the result of which was that GlobalSCAPE was able to announce its "highest revenue quarter in GlobalSCAPE's history." Without these sales, GlobalSCAPE would have missed its targets for a fourth straight quarter. These eleventh-hour sales that allowed GlobalSCAPE to meet its targets, including the fraudulent purchase order forwarded to a Company executive on December 30, 2016, would have surely raised red flags. Indeed, late-year surges in revenues and earnings that allow a company to reverse negative trends from previous quarters are tell-tale signs

of earnings manipulation. *See* Das, S., P. Shroff and H. Zhang, *Quarterly Earnings Patterns and Earnings Management*, 26 CONTEMP. ACCT. RES., No. 3, 797-831, 797 (2009).

84.     On January 9, 2017, Defendants Brown and Mann sold a fifteen percent stake in the Company to a private investment vehicle, walking away with approximately $12 million in cash. The criminal information filed against Daniel Burke alleges that the financial results for the fourth quarter of 2016 were important because GlobalSCAPE "was seeking external investors for a potential major [GlobalSCAPE] share purchase in the first quarter of 2017."

85.     With regard to the sale, Defendant Goulet was quoted as follows:

"Thomas W. Brown and David L. Mann's investments in the Company and guidance as part of our Board of Directors have been incredibly impactful to the organization. **Tom and David essentially founded GlobalSCAPE** when they purchased their stock positions in 2002. We are very pleased to have their continued commitment to the Company after nearly 15 years of service. **This sale of common stock will help Tom and David accomplish some of their personal financial planning goals**, while allowing us to maintain our industry leadership position and set the course for our long-term strategy as we chart the next phase of growth."

(emphasis added).

86.     On March 27, 2017, GlobalSCAPE dismissed its independent public accounting firm, RSM.

87.     On April 12, 2017, GlobalSCAPE formally engaged BDO as its new independent accounting firm.

88.     The Company became aware of the improper revenue recognition in May of 2016.

89.     Defendant Mann served as Chair of GlobalSCAPE's Audit Committee.

90.     As Chair of the Audit Committee, Defendant Mann consciously withheld information regarding the improper revenue recognition from BDO until July of 2017. As members of the Audit Committee, Morgan and Hicks knew the Company was investigating the improper revenue recognition and knew BDO was not informed of the investigation.

91.    As Chair of the Audit Committee, Defendant Mann, was also at the forefront of GlobalSCAPE's efforts to withhold information from BDO as well as the decision to refuse BDO's repeated requests to hire independent outside counsel to conduct the internal investigation. Morgan and Hicks also refused to replace GlobalSCAPE's conflicted counsel and replace them with a non-conflicted counsel, as requested by BDO.

92.    In withholding information regarding the investigation from BDO and by repeatedly refusing to hire independent outside cunsel, Defendants Mann and Brown were able to conceal that they had just sold $12 million of their personal shares to a private investment vehicle shortly after the improper recognition of revenue that made it falsely appear that GlobalSCAPE had met its growth targets.

93.    Rather than work closely with GlobalSCAPE's independent registered accounting firm to ensure that any fraud would be detected and remediated, Defendants consciously impeded BDO from being able to perform its job.

94.    Defendant Mann disclosed to BDO that in May 2017, GlobalSCAPE became aware of the misconduct leading to the Restatement. It is reasonable to infer that Defendants knew of the phony sales transaction when they certified that the Company's internal financial controls were adequate when it filed its 10-Q/A on May 26, 2017.

95.    As a result, GlobalSCAPE did not have adequate internal financial controls and Defendants either knew this, or in reckless disregard for the truth, certified that the Company did have adequate internal controls. Even if Defendants were not initially aware of the material weaknesses; withholding information from BDO and refusing to engage independent outside counsel at BDO's urging constituted a failure to take timely and appropriate remedial action to address the material weaknesses.

96.     It is also reasonable to infer that GlobalSCAPE would have continued withholding the information regarding the improper revenue had BDO not delivered its 10A Letter to the Company after its dismissal. The 10A Letter was a reportable event, and so, on August 7, 2017, Defendants were finally forced to disclose the information it had been consciously withholding.

97.     As indicated by Assistant United States Attorney Surovic, the investigation into GlobalSCAPE is continuing, and Burke was only the first individual "to come in". The Grand Jury investigation will reveal the full extent of the misconduct that led to the Restatement as well as GlobalSCAPE's mishandling of the information regarding the misconduct as it came to light.

## CLASS ACTION ALLEGATIONS

98.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired GlobalSCAPE securities between January 26, 2017 through November 27, 2017, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

99.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GlobalSCAPE securities were actively traded on the NASDAQ stock exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. As of April 30, 2017, the Company had 21,571,831 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by GlobalSCAPE or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

100.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether the Exchange Act was violated by Defendants;

b.    Whether Defendants omitted and/or misrepresented material facts;

c.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.    Whether the price of the Company's stock was artificially inflated; and

f.    The extent of damage sustained by Class members and the appropriate measure of damages.

101.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

102.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

103.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

104.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

105.    During the Class Period, Plaintiff and the Class purchased GlobalSCAPE securities at artificially inflated prices and were damaged thereby.

106.    On August 7, 2017, after trading had closed, GlobalSCAPE disclosed that its audit committee "has been conducting an investigation into certain transactions in the fourth quarter of 2016 involving improper arrangements with customers that circumvented the Company's internal controls and their potential effect on previously reported revenue." The Company further disclosed that it "intends to effect a restatement of its previously issued financial statements through filing an amended Annual Report on Form 10-K for the year ended December 31, 2016 and an amended Quarterly Report on Form 10-Q for the quarter ended March 31, 2017."

107.    On this news, GlobalSCAPE's share price fell 17.66% to close at $3.87 on August 8, 2017.

108.    This decline is directly attributable to the Company's August 7, 2017 announcement disclosing an ongoing internal accounting investigation and the Company's intention to restate its full year 2016 and first quarter 2017 financial results.

109.    On November 24, 2017, after market hours, GlobalSCAPE filed an 8-K announcing that its auditor RSM was withdrawing because, among other things, it "could no longer rely on management's representations."

110.    On this news, GlobalSCAPE's share price fell on the next market day, November 27, 2017, by 5.36%, to close at $3.71.

111.    This decline is directly attributable to the false statements alleged herein.

## FRAUD ON THE MARKET

112.   Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   The omissions and misrepresentations were material;

c.   The Company's common stock traded in efficient markets;

d.   The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.   Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

113.   At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news ire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

114.    The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

115.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CAUSES OF ACTION

## COUNT I

**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
(Against GlobalSCAPE and the Individual Defendants)**

116.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

117.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

118.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

119.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and

the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### (Against The Individual Defendants and the Control Person Defendants)

120.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

121.   The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

122.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

123.   As set forth above, GlobalSCAPE and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct,

Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

124.    The Control Person Defendants had the power to control and direct the public statements and actions undertaken by GlobalSCAPE. The Control Person Defendants failed to insure that GlobalSCAPE's public statements were truthful and accurate and, as such, are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Control Person Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B.    awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C.    awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.    awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: July 26, 2018

**KENDALL LAW GROUP, PLLC**

/s/ Joe Kendall
Joe Kendall, Texas Bar No. 11260700
Jamie J. McKey, Texas Bar no. 24045262
3811 Turtle Creek Blvd., Suite 1450
Dallas, TX 75219
(214) 744-3000 phone
(214) 744-3015 fax
jkendall@kendalllawgroup.com
jmckey@kendalllawgroup.com

*Liaison Counsel*

**BLOCK & LEVITON LLP**
Jeffrey C. Block
Jacob A. Walker, *pro hac vice forthcoming*
Nate Silver, *pro hac vice forthcoming*
155 Federal Street, Suite 400
Boston, MA 02110
Tel: 617-398-5600
Fax: 617-507-6020
Jeff@blockesq.com
jake@blockesq.com
nate@blockesq.com

*Lead Counsel*

## CERTIFICATE OF SERVICE

I certify that a copy of this document was served by delivery to all other parties in this case entitled to receive such notification through this Court's CM/ECF system on July 26, 2018.

/s/ Joe Kendall
Joe Kendall